**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Berkheimer v. REKM, L.L.C.*, **Slip Opinion No. 2024-Ohio-2787.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-2787

BERKHEIMER, APPELLANT, *v*. REKM, L.L.C., D.B.A. WINGS ON BROOKWOOD ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Berkheimer v. REKM, L.L.C.*, **Slip Opinion No. 2024-Ohio-2787.]**

*Civil law—Negligence—Suppliers of food—In negligence cases involving an injurious substance in food, the correct analysis is that adopted in* Allen v. Grafton—*No breach of duty occurs when consumer could have reasonably expected and guarded against presence of injurious substance in food, and what consumer could have reasonably expected is informed by whether the injurious substance in the food is foreign to or natural to the food—Court of appeals' judgment affirmed.*

(No. 2023-0293—Submitted December 12, 2023—Decided July 25, 2024.)

APPEAL from the Court of Appeals for Butler County,

No. CA2022-03-026, 2023-Ohio-116.

_____

DETERS, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER and DEWINE, JJ., joined. DONNELLY, J., dissented, with an opinion joined by STEWART and BRUNNER, JJ.

**DETERS, J.**

{¶ 1} Michael Berkheimer sued a restaurant, its food supplier, and a chicken farm after he suffered serious medical problems resulting from getting a chicken bone lodged in his throat while he was eating a "boneless wing" served by the restaurant. The trial court determined that as a matter of law, the defendants were not negligent in serving or supplying the boneless wing, and the Twelfth District Court of Appeals affirmed that judgment.

{¶ 2} Berkheimer contends that the court of appeals focused on the wrong question—whether the bone that injured him was natural to the boneless wing—in incorrectly determining that the restaurant did not breach a duty of care in serving him the boneless wing. Berkheimer maintains that the relevant question is whether he could have reasonably expected to find a bone in a boneless wing. And he argues that the resolution of that question should be left to a jury.

{¶ 3} We conclude that the court of appeals got it right. In a negligence case involving an injurious substance in food, it is true—as Berkheimer argues—that whether there was a breach of a duty of care by a supplier of the food depends on whether the consumer could have reasonably expected the presence of the injurious substance in the food and thus could have guarded against it. But that consideration is informed by whether the injurious substance is foreign to or natural to the food. The court of appeals correctly applied this blended analysis in determining that there was no material question of fact about whether Berkheimer could have reasonably expected a bone to be in the boneless wing and thus could have guarded against it. We therefore affirm the judgment of the Twelfth District.

## I. BACKGROUND

**{¶ 4}** One evening, Berkheimer had dinner with his wife and a small group of other people at Wings on Brookwood, a restaurant in Butler County owned by REKM, L.L.C. Berkheimer placed his usual order—boneless wings with parmesan garlic sauce. According to Berkheimer, there was no warning on the menu indicating that the boneless wings could contain bones. He followed his normal practice of cutting each boneless wing into two or three pieces before eating it. He testified that after he cut the second boneless wing into three pieces and was eating the third piece, "[i]t felt like something went down, a piece of meat went down the wrong pipe." He went to the restroom to try to clear whatever was in his throat but was unsuccessful.

**{¶ 5}** In the following days, Berkheimer had a fever and was unable to keep food down. Three days after eating the boneless wings, Berkheimer went to an emergency room. In response to his wife's concern that he might have something stuck in his throat, a doctor examined Berkheimer's throat and discovered a thin chicken bone lodged in his esophagus. Medical records referred to the object as a "5cm-long chicken bone." According to Berkheimer, the bone tore his esophagus, causing a bacterial infection in his thoracic cavity and resulting in ongoing medical issues.

**{¶ 6}** During his deposition, Sam Platt, a cook for Wings on Brookwood, described the process for preparing boneless wings. Platt explained that the boneless wings were made from pre-butterflied, boneless, skinless chicken breasts that were supplied to REKM by Gordon Food Service, Inc. ("GFS"). When cutting a chicken breast into individual "wings," he made roughly the same cuts every time, resulting in approximately 20 boneless, one-inch chunks. Platt estimated that he physically touched about 90 percent of the boneless wings before they were served to customers.

**{¶ 7}** Berkheimer filed a complaint against REKM, GFS, and Wayne Farms, L.L.C., the latter of which had sold the chicken to GFS. His complaint alleged claims of negligence, breach of warranty, adulterated food, misbranded food, and violations of the Ohio Deceptive Trade Practices Act, R.C. 4165.01 et seq.[1]

**{¶ 8}** REKM, GFS, and Wayne Farms filed motions for judgment on the pleadings, which the trial court granted. The Twelfth District reversed the trial court's judgment, concluding that "[t]he trial court [had] lacked the facts necessary to determine beyond doubt that Berkheimer could prove no set of facts that may entitle him to relief." *Berkheimer v. REKM, L.L.C.*, 2018-Ohio-2668, ¶ 17 (12th Dist.). The case was remanded to the trial court. *Id.* at ¶ 28.

**{¶ 9}** After the parties conducted further discovery, REKM, GFS, and Wayne Farms filed motions for summary judgment. The trial court granted the motions, determining that common sense dictated that the presence of bone fragments in meat dishes—even dishes advertised as "boneless"—is a natural enough occurrence that a consumer should reasonably expect it and guard against it.

**{¶ 10}** Berkheimer appealed the trial court's grant of summary judgment to the Twelfth District, which affirmed the trial court's judgment. Finding that the bone was natural to the boneless wing and "would have encompassed nearly the entire third bite of the boneless wing," 2023-Ohio-116, ¶ 29 (12th Dist.), the court of appeals held that under Ohio law, "a reasonable consumer could have reasonably anticipated and guarded against the bone at issue in this case," *id.* at ¶ 30.

**{¶ 11}** We accepted jurisdiction over Berkheimer's appeal to consider two propositions of law:

---

1. Berkheimer also alleged a subrogation claim against United Healthcare Services, Inc. That claim was dismissed.

1. As a matter of law, whether a consumer should reasonably expect, anticipate, and guard against an injurious substance that has specifically been disclaimed by the seller is [a] jury question.

2. This Court should bring Ohio in line with the rest of the country.

*See* 2023-Ohio-1769.

## II. ANALYSIS

{¶ 12} Berkheimer contends that Wayne Farms, GFS, and REKM were negligent in producing, distributing, or serving a boneless wing with a bone in it. "[I]n order to establish actionable negligence, one must show the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom." *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984), citing *Di Gildo v. Caponi*, 18 Ohio St.2d 125 (1969), and *Feldman v. Howard*, 10 Ohio St.2d 189 (1967). With respect to a sale of food, this court has framed the question of negligence as whether the seller, "in the exercise of ordinary care, should have known that [the food] was unfit to eat." *Allen v. Grafton*, 170 Ohio St. 249, 251 (1960).

{¶ 13} Berkheimer urges this court to "bring Ohio in line with the rest of the country" and adopt what the Twelfth District referred to as the "reasonable expectation" test, 2023-Ohio-116 at ¶ 19 (12th Dist.), for determining whether a food supplier breached a duty of care. While acknowledging that this court already adopted the reasonable-expectation test in *Allen*, Berkheimer maintains that the Twelfth District erred when it applied what that court referred to as the "foreign-natural" test,[2] 2023-Ohio-116 at ¶ 19. As we discuss below, we decline to adopt one test to the exclusion of the other. Instead, we reaffirm that Ohio courts should

---

2. For ease of discussion in this opinion, we use the labels given to the tests by the Twelfth District.

use the analysis that we adopted in *Allen*, which is a blend of the two tests. And we conclude that the Twelfth District properly applied the blended analysis.

A. *This court has adopted a blend of the "foreign-natural" and "reasonable-expectation" tests*

{¶ 14} In *Allen*, this court considered whether a restaurant owner had exercised ordinary care when it served to a patron an order of six fried oysters when one of the oysters had a piece of a shell in it. *Allen* at 251-252. In concluding that the oysters were not unfit to eat, this court considered two tests used by courts in other states—the foreign-natural test and the reasonable-expectation test. *Id.* at 252-259.

{¶ 15} Like its name suggests, the foreign-natural test looks to whether the injurious substance found in the food was foreign to or natural to the food. *See Allen*, 170 Ohio St. at 252-254. If there was an injurious foreign substance in a food, the food was not reasonably fit to eat and the supplier breached its duty of care. *See id.* at 253. In *Allen*, this court considered a case from California in discussing the foreign-natural test. *Id.* at 252. In *Mix v. Ingersoll Candy Co.*, 6 Cal.2d 674, 676 (1936), a patron of a restaurant was injured when the patron swallowed a chicken-bone fragment that was in a chicken pie. In determining whether the restaurant owner had been negligent, the court distinguished between "the presence in food of bones which are natural to the type of meat served" and "the presence of a foreign substance, or an impure and noxious condition of the food itself, such as for example, glass, stones, wires or nails in the food served, or tainted, decayed, diseased, or infected meats or vegetables." *Mix* at 681. In concluding that the restaurant owner was not negligent, the court explained that the question was

> whether or not a restaurant keeper in the exercise of due care is
> required to serve in every instance a perfect chicken pie, in that all

6

> bones are entirely eliminated. If the customer has no right to expect such a perfect product, and we think he is not so entitled, then it cannot be said that it was negligence on the part of the restaurant keeper to fail to furnish an entirely boneless chicken pie.

*Id.* at 683; *see also Brown v. Nebiker*, 229 Iowa 1223, 1234 (1941) ("certainly small bones in a pork chop are not a foreign substance to the pork chop"); *Norris v. Pig'n Whistle Sandwich Shop, Inc.*, 79 Ga.App. 369, 375-377 (1949) (same regarding bone fragment in barbecued-pork sandwich); *Courter v. Dilbert Bros., Inc.*, 186 N.Y.S.2d 334, 338, 344 (1958) (same regarding prune pit in prune butter).

{¶ 16} While other states adopted the foreign-natural test, this court was hesitant to embrace it completely. In *Allen*, this court said it was "inclined to agree" with a criticism of the foreign-natural test that stated: "'Insofar as these cases rest on the notion of "naturalness" in the sense that nothing that is an inherent part of the raw product itself can be a legal defect, they do not hold water. . . . The better test of what is legally defective appears to be what consumers customarily expect and guard against.' " (Ellipsis added in *Allen*.) *Allen* at 258, quoting Dickerson, *Products Liability and the Food Consumer*, § 4.2 and 4.3, at 185 (1951). This court determined that if a reasonable consumer would expect to encounter and thus would guard against the injurious substance—that is, if the substance is within a consumer's reasonable expectation of what might be present in the food—the supplier could not be said to have violated its duty of care. *See id.*

{¶ 17} However, this court did not cast aside the foreign-natural test. The test remained relevant to determining whether a supplier of food was negligent: "[T]he fact, that something that is served with food and that will cause harm if eaten is natural to that food and so not a 'foreign substance,' will usually be an important factor in determining whether a consumer can reasonably anticipate and guard against it." *Id.* at 258-259. Thus, "the possible presence of a piece of oyster shell

in or attached to an oyster is so well known to anyone who eats oysters that we can say as a matter of law that one who eats oysters can reasonably anticipate and guard against eating such a piece of shell, especially where it is as big a piece as the one described in plaintiff's petition." *Id.* at 259. This court concluded that the restaurant owner was not negligent. *Id.*

**{¶ 18}** Today we reaffirm the rule that we adopted in *Allen*: To determine whether a supplier of food breached its duty of care by failing to eliminate an injurious substance from the food, we look to whether the presence of the substance was something that the consumer could have reasonably expected and thus could have guarded against. And whether the substance was foreign to or natural to the food is relevant to determining what the consumer could have reasonably expected.

### B. *The court of appeals got the analysis correct*

**{¶ 19}** In addition to seemingly arguing that we should adopt the reasonable-expectation test to the exclusion of the foreign-natural test—a conclusion we reject—Berkheimer contends that "whether a consumer should reasonably expect to encounter an injurious substance that the seller specifically avers has been removed should, at a minimum (and assuming the averment is bona fide) always be a jury question." We decline to paint such a broad line. Berkheimer has demonstrated no reason why a negligence case involving an injurious substance in food should be treated differently from any other negligence case for purposes of summary judgment. Thus, we reiterate that summary judgment is appropriate "when an examination of all relevant materials filed in the action reveals that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Smith v. McBride*, 2011-Ohio-4674, ¶ 12, quoting Civ.R. 56(C).

**{¶ 20}** Contrary to Berkheimer's assertion, the Twelfth District properly conducted its review of the trial court's summary-judgment decision, using the blended analysis that this court described in *Allen*, 170 Ohio St. at 258-259. The

court of appeals considered whether the bone that was in the "boneless wing" was foreign to or natural to the food: "[B]ecause the chicken bone at issue here was natural to the chicken meat used to produce the boneless wings, we conclude it cannot legitimately be considered an unnatural or 'foreign substance.' " 2023-Ohio-116 at ¶ 26 (12th Dist.). Berkheimer does not challenge this conclusion. Instead, he takes issue with the court of appeals' conclusion as to whether he could have "reasonably expected" a bone to be in the boneless wing.

{¶ 21} In considering whether Berkheimer could have reasonably expected the bone to be in the boneless wing, the court of appeals took into account that the boneless wings were prepared by cutting a chicken breast into one-inch pieces that were then fried. *Id.* at ¶ 27. The court noted that the chicken had not been "ground or further manipulated prior to serving." *Id.* In this way, the boneless wings were analogous to a fish fillet—and "'everyone . . . knows that tiny bones may remain in even the best fillets of fish,' " *Mathews v. Maysville Seafoods, Inc.*, 76 Ohio App.3d 624, 627 (12th Dist. 1991) (holding as a matter of law that a consumer should reasonably expect the presence of a fish bone in a fish fillet), quoting *Yong Cha Hong v. Marriott Corp.*, 656 F.Supp. 445, 449 (D.Md. 1987).

{¶ 22} The court of appeals also considered the size of the bone swallowed by Berkheimer, which it noted was approximately $1^3/_8$ inches long: "Such a bone is rather large given the description of the boneless wing's size in the record, as well as Berkheimer's decision to cut the wing into three bite sized pieces." 2023-Ohio-116 at ¶ 29. Like the oyster shell at issue in *Allen*, it is apparent that the bone ingested by Berkheimer was so large relative to the size of the food item he was eating that, as a matter of law, he reasonably could have guarded against it. And that is precisely what the court of appeals concluded: "[A] reasonable person could have anticipated and guarded against a similarly large-sized bone concealed in a bite size piece of chicken." 2023-Ohio-116 at ¶ 29.

{¶ 23} Berkheimer protests that the court of appeals did not give due consideration to the fact that the food item was advertised as a "boneless wing" and that there was no warning given that a bone might be in the boneless wing. Regarding the latter argument, a supplier of food is not its insurer. And regarding the food item's being called a "boneless wing," it is common sense that that label was merely a description of the cooking style. A diner reading "boneless wings" on a menu would no more believe that the restaurant was warranting the absence of bones in the items than believe that the items were made from chicken wings, just as a person eating "chicken fingers" would know that he had not been served fingers. The food item's label on the menu described a cooking style; it was not a guarantee.

{¶ 24} The dissent wonders what would happen in cases involving food that was advertised as lactose-free or gluten-free. Obviously, such cases are not before us. But unlike the presence of the bone in this case, the presence of lactose or gluten in a food that was advertised as lactose-free or gluten-free is not something a consumer would customarily expect and be able to guard against.

{¶ 25} The Twelfth District properly considered whether Berkheimer could have reasonably expected a bone to be in the boneless wing and thus could have guarded against it. And its consideration was appropriately informed by the fact that a bone is natural to a piece of a chicken breast. When determining whether summary judgment is appropriate, a court considers whether "reasonable minds [could] come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment [was] made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." Civ.R. 56(C). Here, reasonable minds could come to but one conclusion—that REKM, GFS, and Wayne Farms did not breach a duty of care.

### III. CONCLUSION

{¶ 26} Regarding negligence cases involving an injurious substance in food, we reaffirm that the correct analysis is the one we adopted in *Allen*. There is no breach of a duty when the consumer could have reasonably expected and guarded against the presence of the injurious substance in the food. And what the consumer could have reasonably expected is informed by the determination whether the injurious substance in the food is foreign to or natural to the food. Because the Twelfth District Court of Appeals properly applied this analysis, we affirm its judgment.

Judgment affirmed.

―――――――――――

**DONNELLY, J., joined by STEWART and BRUNNER, JJ., dissenting.**

{¶ 27} The result in this case is another nail in the coffin of the American jury system. The majority has taken it upon itself to decide the facts of this case and has determined that there is no set of facts under which appellant, Michael Berkheimer, the plaintiff in the underlying negligence action, can establish the defendants' negligence. Today, the majority declares as a matter of law that no reasonable person could consider the facts of this case and reach a conclusion contrary to the one it reaches. This is, of course, patently untrue given that I and two other justices of this court dissent from the majority's judgment.

{¶ 28} Despite my vehement disagreement with the majority on the merits of this case, I have no problem with the law that the majority opinion posits. The majority opinion states:

> To determine whether a supplier of food breached its duty of care
> by failing to eliminate an injurious substance from the food, we look
> to whether the presence of the substance was something that the
> consumer could have reasonably expected and thus could have

guarded against. And whether the substance was foreign to or natural to the food is relevant to determining what the consumer could have reasonably expected.

Majority opinion, ¶ 18.

{¶ 29} This statement of law is the essence of *Allen v. Grafton*, 170 Ohio St. 249, 258 (1960), which embraced the "reasonable-expectation" test and which we should reaffirm. In *Allen*, a restaurant patron suffered injuries after swallowing a piece of an oyster shell that was in a serving of fried oysters. *Id*. at 249-250. After discussing the two predominant tests for determining whether a food provider breached a duty of care, this court determined that the "'better test of what is legally defective appears to be what consumers customarily expect and guard against,' " *id.* at 258, quoting Dickerson, *Products Liability and the Food Consumer*, § 4.2 and 4.3, at 185 (1951), which is the reasonable-expectation test, and concluded that it was unnecessary to determine whether the shell was foreign to or natural to the food, *id*. at 258-259. This court considered—and specifically declined to adopt— the "foreign-natural" test. *Id*. Among the reasons that the foreign-natural test has been criticized is that "it assumes that all substances which are natural to the food in one stage or another of preparation are, in fact, anticipated by the average consumer in the final product served." *Betehia v. Cape Cod Corp*., 10 Wis.2d 323, 328 (1960). That concern is relevant here because three different defendants have been accused of negligence—the entity that raised and sold the chicken to the wholesaler, the wholesaler, and the restaurant that prepared and served the boneless wings.

{¶ 30} This case is incredibly straightforward. The issue is whether Berkheimer, who swallowed a bone while eating a boneless chicken wing, should be able to present to a jury his negligence claim against those who supplied or who prepared and served the wing or whether a judge may decide, as a matter of law,

that Berkheimer cannot under any circumstances establish the defendants' negligence. The answer to that question should also be straightforward: a jury is allowed to hear the case. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 343 (1979) (Rehnquist, J., dissenting) ("The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary . . . .").

{¶ 31} The virtues of the jury system are often glowingly extolled, even by this court. Article I, Section 5 of the Ohio Constitution states that "[t]he right of trial by jury shall be inviolate." This court has stated that "[t]he right of trial by jury should be as inviolate in the working of our courts as it is in the wording of our Constitutions." *Gibbs v. Girard*, 88 Ohio St. 34, 47 (1913). And the United States Supreme Court has stated that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935). Alas, a majority of this court has decided this case on the facts, circumventing the right to trial by jury in a way that ignores an "important bulwark against tyranny and corruption," *Shore* at 343 (Rehnquist, J., dissenting), and instead leaving those decisions to the whim of the judiciary. *See* 4 Blackstone, *Commentaries on the Laws of England*, 342-344 (1769) (the right to trial by jury must be protected "not only from all open attacks, . . . but also from all secret machinations, which may sap and undermine it").

{¶ 32} In my view, the majority opinion makes a factual determination to ensure that a jury does not have a chance to apply something the majority opinion lacks— common sense—stating that "it is apparent that the bone ingested by Berkheimer was so large relative to the size of the food item he was eating that, as a matter of law, he reasonably could have guarded against it," majority opinion at

¶ 22.  Instead of relying on the collective wisdom of the jurors, the majority affirms the trial court's grant of summary judgment to the defendants, determining that there is no way that any of them could have been negligent in this case.

{¶ 33} We review decisions granting summary judgment de novo, *Caldwell v. Whirlpool Corp.*, 2024-Ohio-1625, ¶ 12, and we affirm such judgments only when "reasonable minds c[ould] come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment [was] made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor," Civ.R. 56(C).  The majority concludes that there is no way that the defendant company that processed the chicken breasts and sold them in boxes marked "boneless" could have been negligent.  The majority also concludes that there is no way that the food wholesaler that repackaged and sold the chicken in boxes marked "boneless" could have been negligent.  Finally, the majority concludes that there is no way that the restaurant that prepared and served the chicken based on a menu labeling the chicken "boneless" could have been negligent.  Did the majority construe the evidence most strongly in favor of Berkheimer?  If it did, then I suggest that the majority suffers from a serious, perhaps disingenuous, lack of perspective in opining that there is only one conclusion that can be reached, even as it confronts this dissent, which obviously reaches a different conclusion.

{¶ 34} The majority opinion quotes with approval the Twelfth District Court of Appeals' decision, noting that the bone that Berkheimer swallowed "'would have encompassed nearly the entire third bite of the boneless wing.'" Majority opinion at ¶ 10, quoting 2023-Ohio-116, ¶ 29 (12th Dist.).  If that conclusion is true, it should be determined by an appropriate finder of fact—such as a jury—which appellate courts are not.  Chicken bones can be very delicate, even those that are $1^{3/}{}_{8}$ inches long—the size of the bone that harmed Berkheimer, as noted by the court of appeals.  *See* 2023-Ohio-116 at ¶ 29. That is about the size of

many needles, which are famously good at hiding. Imagine how well a slender chicken bone can remain hidden in something that is not easily picked apart, especially when the person that might encounter the bone does not expect it to be there. But according to the majority opinion, there is no way that any of the defendants could have been negligent. Instead, it concludes that Berkheimer alone bore the burden and expense of finding the bone in the boneless wing. I am not convinced, based on the record before us, that the defendants were negligent, but I am not so confident in their policies and practices as to declare that reasonable minds could come only to the conclusion that they were not negligent.

{¶ 35} Instead of making their own factual determinations, the majority and the court of appeals should have allowed a jury to apply the reasonable-expectation test, which asks what a consumer like Berkheimer could have "reasonably anticipate[d] and guard[ed] against," *Allen*, 170 Ohio St. at 259, to the facts of this case. Even though the *Allen* court stated that the naturalness or foreignness of a substance in food might be an important factor in determining whether a consumer should have reasonably anticipated and guarded against the substance, *id.* at 258-259, this court today implicitly adopts the foreign-natural test as *the factor* rather than *a factor* in determining what amounts to a reasonable expectation. The majority's decision ossifies one factor as the rule and declares that if a substance is "natural" to a food product, a consumer who is injured while eating the product has no recourse regardless of how negligent the supplier or provider of the product might have been.

{¶ 36} The absurdity of this result is accentuated by some of the majority's explanation for it, which reads like a Lewis Carroll piece of fiction. The majority opinion states that "it is common sense that [the label 'boneless wing'] was merely a description of the cooking style." Majority opinion at ¶ 23. Jabberwocky. There is, of course, no authority for this assertion, because no sensible person has ever written such a thing. The majority opinion also states that "[a] diner reading

15

'boneless wings' on a menu would no more believe that the restaurant was warranting the absence of bones in the items than believe that the items were made from chicken wings, just as a person eating 'chicken fingers' would know that he had not been served fingers." *Id.* at ¶ 23. More utter jabberwocky. Still, you have to give the majority its due; it realizes that boneless wings are not actually wings and that chicken fingers are not actually fingers.

{¶ 37} The majority's burst of common sense was short-lived, however, because its opinion also says that no person would conclude that a restaurant's use of the word "boneless" on a menu was the equivalent of the restaurant's "warranting the absence of bones." *Id.* Actually, that is exactly what people think. It is, not surprisingly, also what dictionaries say. "Boneless" means "without a bone." Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary /english/boneless#google_vignette (accessed June 6, 2024) [https://perma.cc/9C89-EXWC]. It means "without bones." Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/boneless (accessed June 6, 2024) [https://perma.cc/VFT8-RMEY]; YourDictionary, https://www.yourdictionary.com/boneless (accessed June 6, 2024) [https://perma.cc/5PTY-9K2G]. And it means "(of meat or fish) without any bones." Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/english/boneless (accessed June 6, 2024) [https://perma.cc/5JD8-KTDZ].

{¶ 38} The question must be asked: Does anyone really believe that the parents in this country who feed their young children boneless wings or chicken tenders or chicken nuggets or chicken fingers expect bones to be in the chicken? Of course they don't. When they read the word "boneless," they think that it means "without bones," as do all sensible people. That is among the reasons why they feed such items to young children. The reasonable expectation that a person has when someone sells or serves him or her boneless chicken wings is that the chicken

does not have bones in it. *See O'Dell v. DeJean's Packing Co., Inc*., 585 P.2d 399, 402 (Okla.App. July 18, 1978) ("If one purchases a whole fish to bake surely he or she could 'reasonably expect' to find bones in it. However, if one purchases fish patties or fish sticks, it seems unrealistic to say he would 'reasonably expect' to find bones in the processed items."). Instead of applying the reasonable-expectation test to a simple word—"boneless"—that needs no explanation, the majority has chosen to squint at that word until the majority's "sense of the colloquial use of language is sufficiently dulled," *In re Ohio Edison Co*., 2019-Ohio-2401, ¶ 67 (DeWine, J., concurring), concluding instead that "boneless" means "you should expect bones."

{¶ 39} As noted above, I certainly am not convinced at this stage of the proceedings that the processor, the wholesaler, or the server of the chicken was careless (or negligent). But I am convinced that Berkheimer should be able to present evidence of their negligence to a jury. Jurors likely have eaten boneless wings, some will have fed boneless wings to their children, and jurors have common sense. They will be able to determine, better than any court, what a consumer reasonably expects when ordering boneless wings. *See Parklane Hosiery Co*., 439 U.S. at 343-344 (Rehnquist, J., dissenting) ("Trial by a jury of laymen rather than by the sovereign's judges was important to the founders because juries represent the layman's common sense . . . and thus keep the administration of law in accord with the wishes and feelings of the community.").

{¶ 40} The majority may be concerned about the dreaded "slippery slope": What if everyone who chokes on a bone can sue the restaurant that served them the food containing the bone? The answer is simple: they won't, because not everyone who ingests a bone requires surgery; not everyone who ingests a bone does so after ordering food from a menu declaring the food to be boneless; and a warning consistent with the majority's view in this case could be added to menus— something like: "Dear customer, please be advised that our boneless wings may

include bones"—which would obviously affect the consumer's reasonable expectations. Moreover, the slippery-slope argument undeniably works the other way. Given the majority opinion here, it is not a stretch to believe that this court would consider a person who was served lactose after they ordered a food labeled "lactose free," or a person who was served gluten after they ordered a food labeled "gluten free," or a person who was served nuts after they ordered a food labeled "nut free," to be without a remedy. People can die under some of those circumstances, and this court would point to the decision in this case and say that lactose and gluten and nuts are natural to foods, so there is no possible way that a defendant who processed or wholesaled or served them could have been negligent. "Naturalness" has swallowed the reasonable-expectation test.

{¶ 41} We should reaffirm *Allen*, 170 Ohio St. 249, which adopted the reasonable-expectation test and not the foreign-natural test. We should reverse the Twelfth District's judgment and remand the matter to the trial court with instructions for it to allow Berkheimer to present his case to a jury of his peers, which could appropriately determine what an Ohioan should reasonably expect when ordering boneless chicken wings. Because the majority does otherwise, I dissent.

_____

Robinson Law Firm, L.L.C., and Emmett E. Robinson; Stokar Law, L.L.C., and Robb S. Stokar; and Minnillo Law Group Co., L.P.A., and Paul J. Minnillo, for appellant.

Markesbery & Richardson Co., L.P.A., and Samuel A. Gradwohl, for appellee REKM, L.L.C., d.b.a. Wings on Brookwood.

Locke Lord, L.L.P., T. Patrick Byrnes, and Hugh S. Balsam, for appellees Wayne Farms, L.L.C., and Gordon Food Service, Inc.

Green & Green and Jared A. Wagner, for appellee Gordon Food Service, Inc.

Murray & Murray Co., L.P.A., and Margaret M. Murray, urging reversal for amicus curiae, Ohio Association for Justice.

_____